

**NAILAH K. BYRD**
**CUYAHOGA COUNTY CLERK OF COURTS**
1200 Ontario Street
Cleveland, Ohio 44113

## Court of Common Pleas

**New Case Electronically Filed:**
**August 13, 2015 12:48**

By: JEFFREY J. FANGER 0058439

Confirmation Nbr. 517144

CARLA SEE

vrs.

CLEVELAND CLINIC FOUNDATION, ET AL.

CV 15 849699

**Judge:**

JOAN SYNENBERG

**Pages Filed:**  50

IN THE COURT OF COMMON PLEAS
CUYAHOGA COUNTY, OHIO
CIVIL DIVISION

| | | |
|---|---|---|
| Carla See | ) | CASE NO. |
| 4037 Stilmore Rd. | ) | |
| South Euclid, OH 44121 | ) | JUDGE |
| | ) | |
| PLAINTIFF | ) | COMPLAINT FOR |
| | ) | RACIAL DISCRIMINATION, |
| vs. | ) | AGE DISCRIMINATION, FMLA |
| | ) | VIOLATIONS, WRONGFUL |
| The Cleveland Clinic Foundation | ) | TERMINATION, HOSTILE WORK |
| c/o CT Corporation System | ) | ENVIRONMENT, INTENTIONAL |
| 1300 East 9th St. | ) | INFLICTION OF EMOTIONAL |
| Cleveland, OH 44114 | ) | DISTRESS, AND RETALIATORY |
| | ) | DISCHARGE |
| AND | ) | |
| | ) | |
| Cheryl Wright | ) | |
| 9500 Euclid Ave | ) | |
| Cleveland, OH 44195 | ) | |
| | ) | |
| DEFENDANTS | ) | |

## (JURY DEMAND ENDORSED HEREON)

Now comes Plaintiff, Carla See, by and through undersigned Counsel and brings this action for a declaratory judgment, preliminary and permanent injunctive relief, legal and equitable relief and damages, including punitive damages, and statutory attorney's fees for the wrongful acts and failure to act of her former employer, the Cleveland Clinic Inc. ("Clinic") and her supervisor, Cheryl Wright, as set forth below:

1.     Carla See is a resident of South Euclid, Ohio and Cuyahoga County.

2.     Clinic is an Ohio Not-for-Profit Corporation licensed and incorporated to do business in Ohio.

3.     Clinic's principal place of business is in Cleveland, Ohio.

4.    Cheryl Wright is an employee of the Cleveland Clinic.

5.    Cheryl Wright was at all times relevant the supervisor overseeing Ms. See's position at the Clinic.

6.    Ms. See reported to Defendant Wright as Ms. See's supervisor.

7.    All events alleged herein take place in Cuyahoga County.

8.    Venue is proper in Cuyahoga County Court of Common Pleas pursuant to Ohio Civ. R. (3)(B)(1) and (2).

9.    This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this complaint.

## FACTS COMMON TO ALL COUNTS

10.    Plaintiff, Carla See, was born on August 26, 1967.

11.    Ms. See is African American.

12.    Plaintiff worked for the Cleveland Clinic in a different capacity from 1995 to roughly the middle of 2008.

13.    On or about February 24, 2014, Defendant Cleveland Clinic re-hired Plaintiff.

14.    Plaintiff held the position of Department Supervisor II at the clinic, having obtained her Bachelor's degree in Human Relations & Business. Plaintiff is currently studying to obtain her Masters of Science.

15.    Plaintiff has been, at all relevant times, an eligible employee within the meaning of the FMLA [29 U.S.C. SECTION 2611 (2)(A)].

16.    Defendant Clinic is an "employer" as defined by the FMLA [29 U.S.C. SECTION 2611(4)(A)(i)].

17.    Based on information and belief, Defendant Cheryl Wright was hired at the Taussig Cancer Institute as the Nursing Manger for the 2nd floor at some time prior to 2013.

18.    Based on information and belief, Defendant Cheryl Wright was removed from the Nursing Manger position due to personal conflicts with the nursing staff.

19.    Based on information and belief, Defendant Cheryl Wright was then placed over the support staff, including overseeing a Trannace Saleem who was a supervisor with Defendant Clinic.

20.    Based on information and belief, Trannace Saleem reported complaints about Defendant Cheryl Wright to Defendant Clinic's Human Resources Department, resulting in Trannace Saleem's position changing to Trainer and Defendant Clinic's hiring of LaToya Williams to replace Trannace Saleem.

21.    During 2013, LaToya Williams was a Supervisor I employee of Defendant Clinic.

22.    During 2013, LaToya Williams oversaw the Patient Care Assistant.

23.    During 2013, Defendant Cheryl Wright, a Program Manager IV, oversaw LaToya Williams and the schedulers and secretaries.

24.    In December of 2013, an additional Supervisor position was created by Defendant Clinic at the Taussig Cancer Institute due to the need for additional staffing.

25.    Plaintiff was interviewed for this position by Paul Reineck and Defendant Cheryl Wright.

26.    Plaintiff was told during the interview that the Taussig Cancer Institute was understaffed and needed additional staffing.

27.    Plaintiff was hired on February 24, 2014 by Defendant Clinic.

3 of 26

28.     As of the initial date of hiring, LaToya Williams had been promoted to a Supervisor II and continued to oversee the Patient Care Assistant, half of the schedulers and half of the secretaries.

29.     Plaintiff was initially hired in as a Supervisor II during the same period that LaToya Williams was overseeing half of the schedulers and half of the secretaries. Plaintiff was assigned to oversee the other half.

30.     Plaintiff's salary in that position was $55,080.00.

31.     Both Latoya Williams and Plaintiff reported to Defendant Cheryl Wright.

32.     Plaintiff was assigned to the Tausig Cancer Institute as a Supervisor II overseeing approximately 22 employees.

33.     On March 31, 2014, Defendant Cheryl Wright evaluated Plaintiff and found that Plaintiff "actively supports the attainment of the desired Cleveland Clinic Experience through the development of self and others" that she had a "positive attitude" and "team building skills." She stated that Plaintiff had become a mentor for other employees. Defendant Cheryl Wright noted that Plaintiff was a "great addition to Taussig", and that Plaintiff was consistent in keeping meetings with employees and management.

34.     On May 5, 2015, Defendant Cheryl Wright evaluated Plaintiff and found that Plaintiff had improved in many competencies, and fully met expectations in most competencies. Defendant Wright found that Plaintiff demonstrated "exceptional behavior in putting our patients and caregivers first," that she had a "positive attitude," and that she communicated with her team and management in a "consistent, clear and transparent manner." Defendant Wright noted that Plaintiff "keeps promises and follows through on commitments."

35.     In July of 2014, Paul Reineck advised Plaintiff and LaToya Williams that the Defendant Clinic (Tausig Center) needed two supervisors so that Defendant Cheryl Wright could focus on other administrative duties and projects.

36.     On or about July 2014, LaToya Williams was given an approved waiver from Defendant Cheryl Wright to apply for other positions with Defendant Clinic.

37.     In August of 2014, LaToya Williams left her position at the Taussig Cancer Center.

38.     As of August 2014, all three main departments, Patient Care Assistant, Schedulers, and Secretaries reported to Plaintiff, including one Aphresis Scheduler and two Researcher Schedulers constituting approximately 47 – 50 employees.

39.     As of August 2014, Plaintiff continued to report to Defendant Wright.

40.     On or about September 25, 2014, Deborah K. Meeks, CNP, wrote a letter for the benefit of Plaintiff explaining that Plaintiff was under Ms. Meeks' care and would be unable to work due to a medical condition. Exhibit 1.

41.     Plaintiff was being cared for stress, fatigue, and diabetes, and required continuing treatment by a health care provider. Pursuant to 29 U.S.C. SECTION 2611, the combination of ailments constitutes a "serious health condition". 29 CFR 825.113.

42.     Due to her serious health condition, Plaintiff was unable to work.

43.     Debra Meeks provided Plaintiff with a Return to Work letter ("RTW") stating that she would return to work on October 8, 2014. Exhibit 2.

44.     On or about October 2, 2014, Plaintiff informed Defendant Wright that she was under a doctor's care for a medical issue, and would return to work on October 8, 2014.

45.     Plaintiff gave Defendant Wright the letter written by Debra Meeks, CNP that same day.

46.    Defendant Wright was upset with Plaintiff, and requested that Plaintiff return to work on October 6, 2014. Plaintiff informed Defendant Wright that she would return by the 8th at the absolute earliest.

47.    On October 6, 2014, Defendant Wright contacted Plaintiff by email and inquired as to where Plaintiff was. The email incorrectly stated that Plaintiff told Defendant Wright that Plaintiff would return to work on October 6, 2014.

48.    Plaintiff emailed Defendant Wright and again provided Defendant Wright with the Return to Work letter.

49.    On or about October 30, 2014 Plaintiff was given an extensive "Job Performance Improvement Plan" that listed a multitude of areas of improvement according to Defendant Wright. Exhibit 3.

50.    Said plan was radically at odds with the facts of Plaintiff's job performance. The plan noted numerous areas of needed improvement, especially in areas of communication, availability, and time management.

51.    Defendant Wright had evaluated Plaintiff on March 31, 2014, and May 31, 2014, and had evaluated her as meeting expectations on most categories during that time, and had evaluated her as fully meeting expectations during that time. See Exhibits 4 and 5.

52.    Between the dates of November 6, 2014 and November 14, 2014, Plaintiff was cared for by Debra Meeks at the Cleveland Clinic for her underlying medical conditions.

53.    During a meeting in November of 2014, Plaintiff advised Kimberly Bell, Executive Administrator, in a meeting of the issues she was having with respect to the Defendant Cheryl Wright, and that Plaintiff was considering leaving due to the issues with her supervisor.

6 of 26

54. In the meeting, Kim Bell stated to the Plaintiff that she did not want the Plaintiff to leave the position. Kim Bell requested that Plaintiff stay and that Defendant Wright and Plaintiff attempt to resolve the issues between them cooperatively.

55. Toward the end of November 2014, Defendant Cheryl Wright took over the supervision of the Secretaries. However, Plaintiff continued to serve in a limited capacity as secretary supervisor.

56. Sometime in November or early December 2014, based on information and belief, Crystal Cernanec was hired as a Supervisor I.

57. Based upon information and belief, Crystal Cernanec started working on or about January 12, 2015 and was assigned to oversee the Secretaries.

58. Plaintiff was assigned to oversee Patient Care Assistants and all of the Schedulers.

59. Crystal Cernanec is caucasion.

60. Both Crystal Cernanec and Plaintiff reported at that time to Cheryl Wright.

61. On or about February 19, 2015, Plaintiff asked Defendant Wright for copies of Plaintiff's 45 and 90-day performance evaluations.

62. In a meeting in late February, 2015, Kimberly Bell told the Plaintiff that the Taussig center was going to extend working hours as the center was building and preparing for a bigger institute to accommodate patient schedules.

63. On March 6, 2015, Plaintiff was terminated from her position and was told that the reason for her termination was that her position was eliminated due to cost and lack of work. Defendant Clinic sent Plaintiff a notice of termination on or about March 6, 2015. Exhibit 6.

64. The notice of termination stated that her termination date was May 5, 2015. Id.

65. That same day, Plaintiff was told that March 6, 2015 was her last day of employment. She was walked out of the building.

66. The reason given for the termination was the elimination of Plaintiff's position due to cost and efficiency concerns. Id.

67. The reason given for the termination was a pretext.

68. At the time Plaintiff was terminated, Crystal Cernanec was in her 90-day probationary period.

69. Crystal Cernanec was not terminated, and continues to work for the Cleveland Clinic as a department supervisor.

70. Plaintiff was not offered Ms. Cernanec's position.

71. Upon information and belief, Defendant Clinic hired at least one individual to conduct the work that Plaintiff had been doing immediately after firing Plaintiff or alternatively hired Cheryl Wright with the intent of replacing Plaintiff with Cheryl Wright.

72. Pursuant to Defendant Clinic's employment policies, Plaintiff was allowed to accumulate sick time since her hire date.

73. Pursuant to Defendant Clinic's employment policies, Plaintiff was allowed to accumulate vacation time since her hire date.

74. Pursuant to Defendant Clinic's employment policies, Plaintiff was allowed to accumulate personal time since her hire date.

75. Defendant Clinic and Defendant Wright knew that employees would justifiably rely on their promise to allow employees to accumulate sick time.

76. Defendant Clinic and Defendant Wright knew that employees would justifiably rely on their promise to allow employees to accumulate vacation time.

77.     Defendants knew that employees would justifiably rely on their promise to allow employees to accumulate personal time.

78.     As a result of her termination, Plaintiff was forced to liquidate her workplace retirement plan, and incurred damages as a result.

## COUNT I: RACIAL DISCRIMINATION
## IN VIOLATION OF R.C. 4112.02(A)

79.     Plaintiff reavers the foregoing paragraphs as if restated herein.

80.     Pursuant to R.C. 4112.02(A), it is unlawful discriminatory practice for any employer, because of the race of an employee, to discharge without just cause, or otherwise to discriminate against that person with respect to hire, terms, conditions, or any matter directly or indirectly related to employment.

81.     Violating R.C. 4112.02(A) subjects an employer to civil action for damages, injunctive relief, or any other appropriate relief. R.C. 4112.99.

82.     Defendants' discharge of Plaintiff was done without just cause.

83.     Defendants discharged Plaintiff because of her race.

84.     Defendants discriminated against Plaintiff regarding her use of sick leave because of her race.

85.     Defendants discriminated against Plaintiff by discharging her without just cause because of her race.

86.     Defendants' statements that Plaintiff's position was being eliminated was a mere pretext.

87.     Defendant's acts were in violation of R.C. 4112.02 which prohibits the discharge without just cause of any person based upon race or color.

88.     Defendant's actions directly and proximately caused Plaintiff to suffer loss of employment, lost wages, mental and emotional anguish and other losses, and therefore Plaintiff

seeks compensatory damages, attorney fees, and punitive damages in an amount as determined by this Honorable Court to be fair, just, and equitable.

## COUNT II: AGE DISCRIMINATION
## IN VIOLATION OF R.C. 4112.14 AND 4112.02(A)

89.     Plaintiff reavers the foregoing as if restated herein.

90.     Pursuant to R.C. 4112.02(A) and 4112.14 it is unlawful discriminatory practice for any employer, because of the age of an employee, to discharge without just cause, or otherwise to discriminate against that person with respect to hire, terms, conditions, or any matter directly or indirectly related to employment.

91.     Violating R.C. 4112.02(A) is subject to civil action for damages, attorney fees, injunctive relief, or any other appropriate relief.

92.     Violating R.C. 4112.14 is subject to civil action for damages, attorney fees, injunctive relief, or any other appropriate relief.

93.     Defendants' discharge of Plaintiff was done without just cause.

94.     Defendants discharged Plaintiff because of her age.

95.     Defendants discriminated against Plaintiff regarding her use of sick leave because of her age.

96.     Defendants discriminated against Plaintiff by discharging her without just cause because of her age.

97.     Defendants' statements that Plaintiff's position was being eliminated was a mere pretext.

98.     Defendant's acts were in violation of R.C. 4112.14 which prohibits the discharge without just cause of any employee who is aged forty or older.

99.     Defendant's acts were in violation of R.C. 4112.02(A) which prohibits the discharge without just cause of any employee who is aged forty or older.

10 of 26

100.    Defendant's actions directly and proximately caused Plaintiff to suffer loss of employment, lost wages, mental and emotional anguish and other losses and therefore Plaintiff seeks compensatory damage, attorney fees and punitive damages in an amount as determined by this Honorable Court to be fair just and equitable.

### COUNT III: DISCRIMINATION ON THE BASIS OF AGE IN VIOLATION OF R.C. 4112.14

101.    Plaintiff reavers the foregoing paragraphs as if restated herein.

102.    Pursuant to R.C. 4112.14(A), an employer may not discharge any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job and laws pertaining to the relationship between employer and employee without just cause.

103.    Pursuant to R.C. 4112.14(B), an employee suffering from a violation of the above section may institute a civil action against the employer in a court of competent jurisdiction. If the court finds that an employer has discriminated on the basis of age, the court shall order an appropriate remedy which shall include reimbursement to the applicant or employee for the costs, including reasonable attorney's fees, of the action, or to reinstate the employee in the employee's former position with compensation for lost wages and any lost fringe benefits from the date of the illegal discharge and to reimburse the employee for the costs, including reasonable attorney's fees, of the action.

104.    Plaintiff was aged forty or older at the time of termination.

105.    Plaintiff was physically able to perform the duties and otherwise meet the established requirements of the job and laws pertaining to the relationship between employer and employee.

106.    Defendants terminated Plaintiff without just cause.

107.    Defendants terminated Plaintiff as a direct and proximate result of her age.

108.    Defendants' statements that Plaintiff's position was being eliminated was a mere pretext.

109.    Defendants' acts were in violation of R.C. 4112.14 which prohibits the discharge without just cause of any employee who is aged forty or older.

110.    Defendants' actions directly and proximately caused Plaintiff to suffer loss of employment, lost wages, mental and emotional anguish and other losses and therefore Plaintiff seeks compensatory damages, attorney fees and punitive damages in an amount as determined by this Honorable Court to be fair just and equitable.

## COUNT IV: RETALIATION IN VIOLATION OF
## FAMILY AND MEDICAL LEAVE ACT

111.    Plaintiff reavers the foregoing as if restated herein.

112.    Under the Family and Medical Leave Act and its corresponding regulations, it is unlawful for an employer to retaliate or in any manner discriminate against any individual for exercising his or her rights under the FMLA. Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601.

113.    Plaintiff is an eligible employee as defined by the FMLA having worked for the Defendant Clinic for at least one year.

114.    Defendant Clinic is an employer pursuant to the FMLA definition.

115.    Plaintiff was entitled to take medical leave pursuant to the terms and conditions set forth in the FMLA for her own extended medical needs pursuant to her medical provider's recommendations.

116.    Plaintiff gave her supervisor Defendant Wright proper notice of her intent to take medical leave pursuant to the terms and conditions set forth in the FMLA.

117.    Plaintiff informed her supervisor, Defendant Wright, that she would be seeking additional future medical leave pursuant to her rights pursuant to the terms and conditions set forth in the FMLA.

118. Plaintiff worked for the Defendant Clinic in excess of one year and worked at least 1,250 hours in the 12 month period prior to taking medical leave.

119. Defendant Clinic employs fifty or more employees during twenty or more calendar weeks in a given year.

120. Plaintiff had a serious health condition as that term is defined by the FMLA and as such is entitled to take medical leave pursuant to the terms and conditions set forth in the FMLA.

121. Plaintiff was incapacitated for a period of time due to her serious health condition and was unable to perform her duties during her incapacity.

122. Defendant Wright's attempts to encourage Plaintiff to return to work prior to when recommended by her medical provider, was a violation of Plaintiff's rights under the FMLA.

123. Defendant Wrights' attempts to discourage Plaintiff's use of her medical leave was a violation of Plaintiff's rights under the FMLA.

124. Plaintiff was absent for more than three days from her employment due to her medical condition.

125. Plaintiff required treatment two or more times for her medical condition.

126. Plaintiff provided Defendant Clinic and Defendant Wright notice of her need for FMLA leave.

127. Plaintiff provided Defendant Clinic and Defendant Wright notice of her need for medical leave immediately prior to being terminated.

128. Plaintiff conveyed information reasonably adequate to apprise Defendants Wright and Clinic of Plaintiff's request to take leave for her serious health condition that rendered her unable to perform her job.

129.    Plaintiff had been warned by her medical provider, an agent of Defendant Clinic, that if she took FMLA leave it would result in her career at the Clinic being harmed.

130.    Defendant Clinic terminated Plaintiff and otherwise discriminated against Plaintiff in violation of the FMLA.

131.    Upon information and belief, Plaintiff's use of FMLA qualifying leave was a negative factor in Defendant Clinic's decision to terminate Plaintiff.

132.    Defendant Wright's disregard of Plaintiff's medical leave and Plaintiff's return to work instructions was a flagrant and intentional attempt to obstruct Plaintiff's exercise of her rights under the FMLA.

133.    Defendant Clinic, through its agents, received the work restrictions for the Plaintiff from Plaintiff's medical provider.

134.    Defendant Wright received the work restrictions for the Plaintiff from Plaintiff's medical provider.

135.    Defendant Wright knew or should have known that the work restrictions limited Plaintiff's ability to perform her work.

136.    Defendant Clinic knew or should have known that the work restrictions limited Plaintiff's ability to perform her work.

137.    As a direct and proximate result of Defendant Clinic's conduct, Plaintiff has been damaged by her unlawful termination.

138.    Plaintiff has had to retain the services of an attorney and incur reasonable attorney fees and related costs and expenses.

139.    Defendants' conduct was in bad faith because it did not have reasonable grounds to believe that its conduct did not violate the FMLA.

140.    Defendants' statements that Plaintiff's position was being eliminated was a mere pretext.

## COUNT V: WRONGFUL TERMINATION

141.    Plaintiff hereby incorporates by reference all of the allegations contained in the preceding paragraphs as if fully rewritten herein.

142.    Plaintiff was wrongfully terminated in violation of public policy by being terminated due to her race, age and use of medical leave.

143.    Plaintiff was terminated without compliance with company policy and practice with respect to the termination procedure.

144.    Defendants' actions are fundamentally unfair, and against public policy, in terminating Plaintiff in a fashion that is not in compliance with company policy and practice with respect to the termination procedure.

145.    Defendants' actions were not in line with normal company procedures as set forth in the Company's employment manual.

146.    Defendants' actions are fundamentally unfair, and against public policy, which supports a fair workplace and truthful termination procedures.

147.    Defendants' actions to terminate were retaliation, based on the personal issues and previous altercations with Defendant Wright.

148.    Defendants' actions to terminate an employee in retaliation for the employee raising issues regarding her supervisor's actions and behavior are fundamentally unfair and against public policy.

149.    Defendants' actions to terminate were retaliation, based on Plaintiff's seeking to challenge Defendant Wright's employee reviews.

15 of 26

150. Defendants' actions to terminate an employee in retaliation for the employee raising issues regarding her supervisor's reviews are fundamentally unfair and against public policy.

151. Defendants' actions to terminate were retaliation, based on Plaintiff's use of medical leave.

152. Defendants' actions to terminate an employee in retaliation for the employee using their medical leave are fundamentally unfair and against public policy.

153. Defendants' actions to terminate were retaliation, based on Plaintiff's seeking legal counsel with respect to her employment reviews.

154. Defendants' actions to terminate an employee in retaliation for the employee seeking the advice of legal counsel regarding her employment are fundamentally unfair and against public policy.

155. Defendants' actions to terminate were retaliation, based on Plaintiff's refusal to return to work earlier than medically recommended despite multiple requests by Defendant Wright her supervisor.

156. Defendants' actions to terminate an employee in retaliation for the employee refusing to return to work in advance of her medically recommended return to work are fundamentally unfair and against public policy.

157. Defendants were best suited to predict and avoid the issues that give rise to this Complaint, and as a matter of public policy should be prohibited from terminating an employee for actions that any reasonable employer would be able to predict.

158. Defendants failed to follow their own internal and customary policies and procedures with respect to providing an employee with their 45 and 90 day reviews.

159.    Defendants failed to follow their own internal and customary policies and procedures with respect to failing to maintain copies of employees' 45 and 90-day reviews.

160.    Defendant Wright was motivated by malice and/or a retaliatory behavior due to Plaintiff raising issues of concern regarding the management of the department, the management behavior of Defendant Wright, and the use of medical leave by Plaintiff.

161.    Plaintiff, as demonstrated by her work reviews for years, was an excellent employee.

162.    Plaintiff was not provided copies of her prior reviews by Defendant Wright as a means of retaliation by Defendant Wright for Plaintiff raising issues of dispute with Defendant Wright's review process and procedure.

163.    Defendants' disregard for their own policies and procedures, and the swiftness with which Plaintiff was terminated, was a retaliatory termination without merit based upon actions that are clearly contrary to public policy.

164.    Defendants had no reasonable or valid business justification for the termination.

165.    Due to Defendants' actions, constituting wrongful termination in violation of public policy, Plaintiff seeks compensatory damages representing her lost wages in excess of $25,000 in an amount to be proven at trial, punitive damages in an amount as determined by this Honorable Court in an amount sufficient to curtail Defendant for engaging in activities that are contrary to public policy, and her attorney fees and costs.

## COUNT VI: HOSTILE WORK ENVIRONMENT

166.    Defendant Wright has repeatedly harassed Plaintiff with respect to her medical condition and medical leave.

167.    Plaintiff was subjected to disparaging remarks and behavior by Defendant Wright.

168.    Despite repeated requests for her 45 day and 90 day reviews, Defendant Wright unreasonably and without justification refused to provide said records to Plaintiff.

169.    Defendant Wright intentionally changed login times on Plaintiff's Computer to harass and annoy Plaintiff.

170.    Defendant Wright intentionally changed the office "available" signage on Plaintiff's office to harass and annoy Plaintiff.

171.    Defendant Wright intentionally threw boxes and packages down in front of Plaintiff in a hostile and aggressive fashion due to her anger at Plaintiff's use of medical leave.

172.    Defendant Wright harassed and badgered Plaintiff regarding returning to work despite being informed of Plaintiff's medical leave.

173.    Defendant Wright repeatedly harassed Plaintiff regarding taking medical leave.

174.    Defendant Wright has repeatedly harassed Plaintiff due to Plaintiff's age, race and medical condition.

175.    Defendant Wright's actions were unwelcome and the Plaintiff neither solicited nor incited the conduct of Defendant Wright.

176.    Plaintiff regarded the conduct as undesirable and offensive and done to harass, humiliate and demean the Plaintiff.

177. The harassment of the Defendant Wright toward Plaintiff was motivated by Defendant Wright's sexual discrimination, age discrimination, race discrimination and retaliation against Plaintiff due to Plaintiff's medical leave use.

178. Defendant Wright's harassment was pervasive and severe and created an abusive working environment in which the Plaintiff had to work.

179. Defendant Wright's harassment unreasonably interfered with the Plaintiff's work performance.

180. A reasonable person would find Defendant Wright's harassment to be offensive, pervasive and abusive in its treatment of Plaintiff.

181. Defendant Clinic condoned and tolerated the inappropriate and unreasonable harassing actions of its employee Defendant Wright.

182. Defendant Clinic permitted a supervisor in the employ of Defendant Clinic to harass and demean a subordinate despite being aware of the issues between Plaintiff and Defendant Wright.

183. Defendant Clinic knew or should have known of the harassment of the Plaintiff by Defendant Wright.

184. Defendant Clinic failed to take immediate and appropriate corrective action with respect to the harassment by Defendant Wright toward Plaintiff.

185. Defendant Clinic failed to provide adequate management personnel and oversight, which contributed to the unaddressed hostile work environment between Defendant Wright and Plaintiff.

## COUNT VII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

186. Plaintiff hereby incorporates by reference all of the allegations contained in the preceding paragraphs as if fully rewritten herein.

187. Defendant knew or should have known that terminating Plaintiff would cause damage to her professional reputation and would result in serious emotional distress.

188. Defendants knew or should have known that Defendant Wright's behavior toward Plaintiff regarding her medical leave would result in serious emotional distress.

189. Defendant Wright intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to the Plaintiff.

190. Defendant Wright's actions were so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

191. Defendant Clinic's termination of Plaintiff as retaliation against Plaintiff for using medical leave was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

192. Defendant Clinic's termination of Plaintiff as retaliation against Plaintiff for seeking legal assistance, seeking copies of her employment records and raising issues regarding her supervisor's conduct toward Plaintiff, was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

193. Defendant Clinic's agent, Ms. Meeks', warning to Plaintiff not to use FMLA due to possible retaliation against Plaintiff by the Clinic was so extreme and outrageous as to go beyond

Electronically Filed 08/13/2015 12:48 / / CV 15 849699 / Confirmation Nbr. 517144 / CLTLC

all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community.

194.    Defendant Clinic has fostered, encouraged, and supported an unreasonably stressful, hostile and abusive work environment within the Taussig Cancer Center well known to the Defendant and has therefore intentionally and unreasonably created a hostile work environment that predictably results in extreme emotional distress to Plaintiff and other employees of the facility.

195.    Defendant Clinic's termination of Plaintiff, an employee who was raising medical and procedural issues regarding the employment environment at the Tausig Cancer Center, was done in bad faith, with intent to harm and punish the Plaintiff for her actions and was done with intent to inflict additional emotional distress upon the Plaintiff.

196.    Defendant Clinic's management and staff structure at the Taussig Center was known by Defendant Clinic to create an unreasonable level of stress and mental anguish upon employees, and was so severe and pervasive as to result in multiple employees suffering emotional and medical issues from the outrageous and unreasonable amounts of stress caused by Defendant Clinic's staffing and management structure.

197.    Defendant Clinic knew or should have known that it had created a work environment and employment position that was untenable, impossible for an ordinary person to be able to withstand with respect to the amount of stress and emotional burden, and by further discouraging medical treatment, medical leave and similar stress treatment, Defendant Clinic intentionally and/or recklessly had created a hostile work environment that predictably resulted in the infliction of emotional distress to the Plaintiff of a type and nature that can be considered as utterly intolerable in a civilized community.

198. Defendant Clinic knew or should have known that prior employees in the same or similar position as the Plaintiff also suffered severe emotional distress from the staffing and management structure of the position.

199. Defendant Clinic knew or should have known that the staffing level and severity of the medical treatment that the staff were being called upon to do was at such a level that no reasonable person would be able to bear the stress and that a reasonable person would predictably be harmed by the position.

200. Defendant Clinic was either intentionally encouraging such an environment or negligent in its staffing and management to a level that fostered and permitted the unhealthy environment to continue proximately and directly resulting in the infliction of emotional distress to the Plaintiff.

201. Defendant Wright knew of Plaintiff's medical condition, and knew that Defendant Wright's actions and harassing behavior contributed to or acerbated Plaintiff's medical condition.

202. Defendant Wright knew or should have known that her actions would be the proximate cause of Plaintiff's psychic injury.

203. Plaintiff has had to seek medical treatment for her psychic injury.

204. The mental anguish suffered by the Plaintiff as a result of the Defendants actions is of such a nature that no reasonable person could be expected to endure it.

205. Plaintiff's medical provider, an agent of Defendant Clinic, specifically informed Plaintiff that if she claimed FMLA leave that the it would severely harm Plaintiff's career.

206. Plaintiff's medical provider, an agent of Defendant Clinic, attempted to dissuade Plaintiff from exercising her rights to take medical leave.

207.   Defendant Wright and Defendant Clinic's actions were the proximate cause of Plaintiff's psychic injuries. Plaintiff has been subjected to shame, damage to her reputation, and extreme distress, and has had to seek medical treatment due to the actions of Defendants.

208.   Plaintiff has suffered severe mental anguish and shame within her community, both professionally as well as personally. Plaintiff's reputation has been severely damaged due to the intentional actions taken by Defendants.

209.   Due to the intentional infliction of emotional distress by Defendants upon the Plaintiff, Plaintiff seeks compensatory damages and punitive damages in an amount in excess of $25,000.00 as determined by this Honorable Court to be fair just and equitable.

## COUNT VIII: RETALIATORY DISCHARGE

210.   Plaintiff hereby incorporates by reference all of the allegations contained in the preceding paragraphs as if fully rewritten herein.

211.   Ohio has adopted the public policy of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, as sufficient clear public policy to bring a claim of wrongful discharge so long as there is no sufficient remedy available in the FMLA. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240.

212.   The findings of the FMLA are that "there is inadequate job security for employee who have serious health conditions that prevent them from working for temporary periods." 29 U.S.C. § 2601(a)(4).

213.   The purpose of the FMLA is "to entitle employees to take reasonable leave for medical reasons." 29 U.S.C. § 2601(b)(2).

214. Under Ohio law and public policy, it is unlawful for an employer to retaliate against an employee or in any manner discriminate against an employee in violation of the public policy established by the FMLA. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 243.

215. By terminating Plaintiff due to Plaintiff's request for leave pursuant to medical necessity, Defendants discriminated against her in violation of the clear public policy in the FMLA, the clear public policy of Ohio, and Ohio law. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240, 243.

216. Upon information and belief, Defendants terminated Plaintiff employee due to Plaintiff's employee's use of leave as a result of serious medical issues in violation of the Ohio law and clear public policy.

217. As a direct and proximate result of Defendants' conduct, Plaintiff has been damaged by the termination, loss of income and loss of benefits among other things.

218. Plaintiff has had to retain the services of an attorney and incur reasonable attorney fees and related costs and expenses.

219. Defendants' conduct was in bad faith because it did not have reasonable grounds to believe that its conduct did not violate Ohio law.

## COUNT IX: WRONGFUL TERMINATION AND RETALIATION IN VIOLATION OF OHIO LAW AND CLEAR PUBLIC POLICY

220. Plaintiff re-alleges any and all of the allegations contained above in her Complaint as if fully re-written herein.

221. Under Ohio law and public policy, it is unlawful for an employer to retaliate against an employee or in any manner discriminate against an employee for receiving medical treatment for serious and life-threatening medical conditions. *Wiles v. Medina Auto Parts*, 96 Ohio St. 3d 240.

222. Defendants terminated Plaintiff shortly after her return to work from medical leave.

223. Defendants knew or should have known that Plaintiff was going to continue to take medical leave due to the nature of her medical issues.

224. Upon information and belief, Plaintiff's medical conditions and leave were negative factors used by Defendant in its decision to terminate Plaintiff.

225. As a direct and proximate result of Defendants conduct, Plaintiff has been damaged by the termination, loss of salary, wages and fringe benefits, among other things.

226. Plaintiff has had to retain the services of an attorney and incur reasonable attorney fees and related costs and expenses.

227. Defendant's conduct was in bad faith because it did not have reasonable grounds to believe that its conduct did not violate Ohio law and clear public policy.

WHEREFORE, Plaintiff requests that this Court issue judgment in her favor and against Defendants Clinic and Wright, and grant her relief that fully compensates her for all damages proximately suffered because of Defendants' unlawful and unjust employment practices in an amount in excess of $25,000 (Twenty Five Thousand Dollars), including:

1)    An order finding that Defendants violated Plaintiff's employment rights under Ohio law and clear public policy;

2)    Full reinstatement of Plaintiff to the same or an equivalent position;

3)    An award of liquidated damages, as well as back pay, compensatory, incidental, consequential and/or liquidated damages, front pay and all other equitable and monetary relief as justice requires;

4)      Punitive damages, as well as compensation for pain, suffering and loss of reputation to the extent permitted by law;

5)      Attorney's fees, court costs and expenses, including expert witness fees;

6)      Prejudgment and as applicable post judgment interest at the prevailing interest rate provided by law; and

7)      Any further relief that this Court deems just and proper.

Respectfully submitted,
Fanger & Associates LLC

Jeffrey J. Fanger (0058439)
Attorney for Plaintiff
36 Alpha Park
Highland Hts., OH 44143
Ph. 216-382-0025
Fax 216-382-0035
jfanger@fangerlaw.com

Jury Demand

Per R.C. 38, Plaintiff hereby demands a trial by jury with the maximum number of jurors on all triable issues herein.

Jeffrey J. Fanger (0058439)

26 of 26

STATE OF OHIO      )
                       )     ss.
COUNTY OF CUYAHOGA )

Now comes CARLA SEE, being first duly sworn according to law, and deposes and states as follows:

1. I am the Plaintiff in this cause of action and as such have knowledge of all the facts stated in this Affidavit.

2. I reside at 4037 Stilmore Road, South Euclid, Ohio 44121, and was hired by the Cleveland Clinic on or about February 24, 2014.

3. I am an African-American.

4. To the best of my knowledge and belief Defendant, Cheryl Wright is and was an employee of the Defendant, Cleveland Clinic, and was my supervisor.

5. I have been informed that Defendant Cheryl Wright was hired at the Taussig Cancer Institute as the Nursing Manger for the 2nd floor at some time prior to 2013.

6. I have been informed that the Defendant Cheryl Wright was removed from the Nursing Manger position due to having problems with the nursing staff.

7. I have been informed that the Defendant Cheryl Wright was removed from the Nursing Manger position due to having problems with the nursing staff.

8. I have been informed that the Defendant Cheryl Wright was then placed over the support staff including overseeing a Trannace Saleem who was a supervisor with Defendant Clinic.

9. I have been informed that Trannace Saleem, reported complaints about Defendant Cheryl Wright to Defendant Cleveland Clinic's Human Resources Department, resulting in Trannace Saleem's position changing to Trainer and Defendant Clinic's hiring LaToya Williams to replace Trannace Saleem.

10. I am aware that during 2013, LaToya Williams was a Supervisor I employee of the Defendant Cleveland Clinic and was the overseer of the Patient Care Assistant.

11. I am aware that during 2013 the Defendant, Cheryl Wright, a Program Manager IV, oversaw LaToya Williams and the schedulers and secretaries.

12. I am aware that in December 2013, an additional Supervisor Position was created by Defendant Clinic at the Taussig Cancer Institute due to the need for additional staffing.

13.    While being interviewed by Paul Reineck, I was told that the Taussig Cancer Institute was understaffed and needed additional staffing.

14.    While being interviewed by Defendant Cheryl Wright, I was told that the Taussig Cancer Institute was understaffed and needed additional staffing.

15.    As of the date of my hiring, LaToya Williams was promoted to a Supervisor II and continued to oversee the Patient Care Assistant, half of the schedulers and half of the secretaries.

16.    I was hired as Supervisor II. During the same period that LaToya Williams was overseeing half of the schedulers and half of the secretaries, I was assigned to oversee the other half.

17.    My salary in that position as a Supervisor II was $55,080.

18.    Latoya Williams and I both reported to the Defendant Cheryl Wright.

19.    I was later assigned to the Tausig Cancer Institute as a Supervisor II overseeing approximately 22 employees.

20.    Some time in July of 2014, Paul Reineck advised me and LaToya Williams that the Defendant Cleveland Clinic (Taussig Center) needed two supervisors so that Defendant Cheryl Wright could focus on other administrative duties and projects.

21.    In July of 2014, LaToya Williams was given an approved waiver from the Defendant Cheryl Wright to apply for other positions with Defendant Cleveland Clinic.

22.    I was denied a waiver in the same month by Paul Reineck.

23.    In August of 2014, LaToya Williams, left her position at the Tausig Cancer Center.

24.    As of August 2014, all three main departments of Tausig Cancer Center, Patient Care Assistant, Schedulers and Secretaries reported to me, including one Aphresis Scheduler and two Researcher Schedulers constituting approximately 47 – 50 employees reporting to me.

25.    As of August 2014, I continued to report to Defendant Cheryl Wright.

26.    Toward the end of November 2014, Defendant Cheryl Wright took over the supervision of the Secretaries.

27.    Sometime in November or early December 2014, I became aware that Crystal Cernanec was hired as a Supervisor I.

28.    I became informed that Crystal Cernanec started on or about January 12, 2015 and was assigned to oversee the Secretaries and I was assigned to oversee Patient Care Assistant and all of the Schedulers.

29.    Crystal Cernanec is Caucasion.

30.    Crystal Cernanec and I both reported at that time to Cheryl Wright.

31.    During a meeting in November of 2014, I advised Kim Bell, Executive Administrator, of the issues I was having with respect to the Defendant Cheryl Wright and that I was considering leaving due to the issues with my supervisor.

32.    In that meeting with Kim Bell, she (Kim Bell) stated to me that she did not want me to leave the position and she requested that I stay and that Cheryl Wright and I should attempt to resolve the issues cooperatively.

33.    On March 6, 2015, I was informed that I would be terminated from my position and told that the reason was that my position was eliminated due to cost and lack of work. The Termination Notice stated that my last day would be in May 5, 2015. The Clinic referred to this period as a "transition period." In reality, I was marched out of the building on that date.

34.    In a meeting in late February, 2015, approximately one week prior to the termination, at a supervisor-manager-administrator meeting, Kim Bell told me that the Taussig Cancer Center was going to extend working hours as the Center is building and preparing for a bigger Institute.

35.    I was informed and aware that, pursuant to Defendant Cleveland Clinic's employment policies, I was allowed to accumulate sick time since my hire date.

36.    I was informed and aware that, pursuant to Defendant Cleveland Clinic's employment policies, I was allowed to accumulate vacation time since my hire date.

37.    I was informed and aware that, pursuant to Defendant Cleveland Clinic's employment policies, I was allowed to accumulate personal time since my hire date.

38.    To the best of my knowledge and belief, the Defendant Cleveland Clinic and Defendant Cheryl Wright knew that employees would justifiably rely on their promise to allow employees to accumulate sick time.

39.    To the best of my knowledge and belief, the Defendant Cleveland Clinic and Defendant Cheryl Wright knew that employees would justifiably rely on their promise to allow employees to accumulate vacation time.

40.    To the best of my knowledge and belief, the Defendant Cleveland Clinic and Defendant Cheryl Wright knew that employees would justifiably rely on their promise to allow employees to accumulate personal time.

41. On or about September 25, 2014, Deborah K. Meeks, CNP, wrote a letter for my benefit explaining that I was under Ms. Meeks' care and would be unable to work due to a medical condition.

42. I was being cared for stress, fatigue, and diabetes.

43. It is my understanding that my conditions constituted a "serious health condition".

44. Deborah K. Meeks, CNP, provided me with a Return to Work letter ("RTW") stating that I would return to work on October 8, 2014.

45. On or about October 2, 2014, I informed Defendant Cheryl Wright that I was being hospitalized for a medical issue, and would return to work on October 8, 2014.

46. I gave Defendant Cheryl Wright the letter written by Deborah K. Meeks, CNP, that same day.

47. The Defendant Cheryl Wright was upset with me, and requested that I return to work on October 6, 2014, and I informed her that I would return by the 8th at the absolute earliest.

48. On October 6, 2014, Defendant Cheryl Wright contacted me by email and inquired as to where I was. The email incorrectly stated that I had told her that I would return to work on October 6, 2014.

49. Between the dates of November 6, 2014 and November 14, 2014, I was cared for by Meeks at the Cleveland Clinic for my underlying medical conditions.

50. On or about January 12, 2015, Crystal Cernance, a Caucasian female, was hired as a Supervisor I to take over part of my staff.

51. On or about February 19, 2015, I asked Defendant Cheryl Wright for copies of my 45 and 90-day performance evaluations.

52. On or about October 30, 2014, I was given an extensive "Job Performance Improvement Plan".

53. That "Job Performance Improvement Plan" was radically at odds with the facts of my job performance.

54. On March 6, 2015, the Defendant, or an agent of Defendant, sent me a notice of termination from my position.

55. On that same day, I was told that March 6, 2015 was my last day of employment.

56. The Notice of Termination stated that my termination date was May 5, 2015, not March 6, 2015.

57.     The reason I was given for my termination of employment was "the elimination of my position."

58.     I strongly believe that the reason so given to me for my termination was a pretext.

59.     I have been informed that the Defendants hired at least one individual to conduct the work that I had been doing immediately after my firing.

60.     I have reason to believe that the Defendant, Cheryl Wright was hired with the intent of replacing me.

        AFFIANT FURTHER SAYETH NAUGHT.

                                                        _Carla See_

                                                        CARLA SEE

        SWORN TO BEFORE ME and subscribed in my presence under oath, this 4th

day of _August_, 2015.

                                                        _____

                                                        NOTARY PUBLIC

                                            NICHOLAS P. WEISS
                                            NOTARY PUBLIC, STATE OF OHIO
                                            My Commission Does Not Expire
                                            Section 147.03 O.R.C.



EXHIBIT

1



**Cleveland Clinic**

**Beachwood Family Health Center**
26900 Cedar Avenue
Beachwood, Ohio, 44122

**Internal Medicine**
Suite 26N
phone (216) 839-3350

**Deborah K Meeks, CNP**

9/25/2014

To Whom It May Concern,

This is to certify that Carla See has been under my care for a medical condition
and is unable to work until cleared by our office.

Thank you in advance for your cooperation,
ELECTRONICALLY SIGNED
Deborah K Meeks, CNP

*Carla See MRN: 23482045*





**Cleveland Clinic**

**Beachwood Family Health Center**
26900 Cedar Avenue
Beachwood, Ohio, 44122

**Internal Medicine**
Suite 26N
phone (216) 839-3350

**Deborah K Meeks, CNP**

10/2/2014

To Whom It May Concern,

This is to certify that Carla See has been under my care for a medical condition and and was unable to work from Sept 26 through Oct 7. The patient may return to work on Oct 8 with the following instructions:
Scheduled lunch and break times daily
No more than 8 hours a day at work.

Please call if you have any questions.

ELECTRONICALLY SIGNED
Deborah K Meeks, CNP

Carla See MRN: 23482045

**EXHIBIT 3**

# ☐ Cleveland Clinic

## JOB PERFORMANCE IMPROVEMENT PLAN (PIP)

Employee Name: __Carla See__

Employee Job Title: __Department Supervisor II__     Department: Heme/Onc

Date of Hire: __2/24/2004__

Length of Time in Current Job: approx. 165 days     Supervisor Name: __Cheryl Wright__

The following job tasks or duties are not being performed at the expected level of competency (please complete below):

| Task | Area of Opportunity | Expected Improvement | Met/Not Met |
|---|---|---|---|
| Communicate with your team and management in a consistent, clear and transparent manner. Recognize the importance of accuracy in communication. | Respond to your employees, management and others whether in person, by e-mails with complete, correct information. Communicate correct key enterprise communication. Communication needs to be sent to your team and management when you are out of the office. Your out of office assistant should also be on with direction on who to contact. | • Be clear, consistent, transparent, accurate and timely in your communication.<br>• Do not communicate something you are unsure or apprehensive about.<br>• Ask for clarification when needed.<br>• E-mails should be complete and fully answer what is being asked. Completely and clearly explain what you are trying to communicate.<br>• Communication needs to be sent to everyone when you are out. It should include name/s and number/s of contacts while you are out.<br>• Use your "out of office assistant" in Outlook so that when you receive e-mails a message is immediately sent to that individual communicating that you are out of the office and also providing alternative contacts until you return. | |

| | | |
|---|---|---|
| Make yourself available to address questions and obstacles as they arise. | Your team and management should be able to get a response from you when needed whether it is by e-mail, phone or page. | • You should be able to respond to emails, pages, telephone calls in a timely manner.<br>• Excuse yourself from a meeting if it is emergent.<br>• Meet with your reports and remind them that when they are paging, emailing or calling you to indicate if it can wait or if they need immediate assistance.<br>• Respond to urgent pages immediately.<br>• Respond to e-mails within an hour with a complete response or with a message explaining when you will be able to follow up. |
| Be consistent in demonstrating Serving Leader behaviors and lead with Emotional Intelligence. | Lead by example and exhibit behaviors in yourself that you would also like to see in your employees. Receive feedback without becoming defensive. | • Be consistent with setting expectations of team and communicate them thoroughly. |

2

| | | |
|---|---|---|
| Actively demonstrate accountability. Demonstrate the organizational value of integrity. | Inconsistencies in the following areas: <ul><li>Deadlines</li><li>Being accountable for shortcomings in own area of responsibility</li><li>Regularly keeping others updated on progress of work, reports, etc.</li><li>Keeping me updated on meetings, projects, operations, etc. that you attend</li><li>Follow through on commitments</li><li>Complete requests from fee coders same day e-mail is sent.</li></ul> Needs to improve on time management skills. Behavior should be consistent with CC values. | <ul><li>Be consistent with deadlines or be proactive in communicating if you are behind.</li><li>Use time effectively and efficiently.</li><li>Give honest and timely feedback.</li><li>Articulate, define and sets clear expectations for self and others.</li><li>Recognize and admits mistakes and take action to correct.</li><li>Plan proactively and seeks out appropriate resources to achieve results. Proactive planning involves designing a desired future and then inventing ways to create that future state. See attachment.</li><li>Handle stress and can be counted on to hold things together during tough times.</li><li>Actively demonstrate accountability and demonstrate value of integrity by listening to others for understanding.</li><li>Value and reward open, honest, two-way communication.</li><li>Be accountable for, and proud of, your conduct and your decisions.</li><li>Only make promises you intend to keep – do what you say you'll do.</li><li>If things change, let people know.</li><li>Create an environment of trust. This can be accomplished by providing correct and timely information and understand that you can learn from them. Foster a fair, respectful, and collaborative work environment. Become a more active listener. This is where you make a conscious effort to hear not only the words that another person is saying but, more importantly, try to understand the complete message being sent. To ensure you are hearing correctly you can say something like. "so I am hearing.....is this correct?"</li><li>Communicate in a professional manner and support the goals of the department. Do not outwardly express negative comments or negative body language in front of direct reports.</li><li>Behavior should be consistent with CC values and moral standards. CC values are "Quality, Innovation, Teamwork, Service, Integrity, Compassion"</li><li>In summary, value based leadership can have many different meanings, but based on my experience, the concept is primarily defined as leading by example, that is, doing the right thing for the right reasons and not compromising core principles.</li></ul> |

3

| | | |
|---|---|---|
| Come prepared to meetings | Attendance at 1:1 meetings need to be better prepared for including communication on meetings (agenda), operational updates/issues, projects and metrics. | • Be prepared at our 1:1 meetings in addition to other meetings. If unable to be prepared notify me ahead of time so we can reschedule.<br>• Be able to update on projects, processes for the past week.<br>• Follow agenda guidelines and add anything that is needed. |
| Learn the process for completing productivity numbers from beginning to end to include the monthly productivity report. | Begin to take over entire process. | • Send productivity numbers out daily.<br>• Monthly numbers should be completed no later than the 7th of the following month.<br>• Please copy Paul and me on these e-mails. If you cannot complete this you need to e-mail us explaining why. |
| Follow up daily with new hires. Be accountable for their training. | Consistency is needed with training new hires. Daily follow up with them is needed. Check list need to be provided, explained and a preceptor assigned. | • With new hires smart forms should be provided to them by you so that you know where they are with their training (just until you are comfortable with the process). Follow up during and at the end of the day to see how they are doing. Follow up should at least be completed once during the day. |
| Regular monthly meetings. Minutes need to be taken at every meeting. | Sporadic meetings. Minutes not being taken. | • Conduct regular monthly meetings with minutes taken at each one. You can assign someone to take minutes.<br>• Minutes need to be e-mailed to me or a copy provided for me. |
| Have at least 2 additional PSR's trained for checking in/out patients in the Apheresis area. Direct them on process to follow when/if K.K. calls off or is on vacation. Write a guideline for them to follow. | Currently Katherine is the only one trained and is regularly working there. Two more need to be trained for back up when needed. | • Train a total of 2 PSR's (3 if you included Katherine) to be efficient and accountable for daily (basic) processes in Apheresis when needed.<br>• Write a guideline for them to follow if K.K. is out.<br>• The training should be completed by the end of December.<br>• The guideline should be completed by the end of December also. |
| Round with a purpose | Rounding should occur daily. | • Round with a purpose.<br>• Check on your areas daily but then keep moving so that you can complete your work. |

Electronically Filed 08/13/2015 12:48 / / CV 15 849699 / Confirmation Nbr. 517144 / CLTLC

| | | |
|---|---|---|
| All reports and regular standing meetings for example Business Deck, 1:1 meetings, productivity numbers(daily, monthly), CRR report (daily), etc. should be completed on or before time and preparation that is needed before meetings should be completed. | There needs to be more consistency with communication in regards to daily updates whether at huddles or 1:1 with anyone unable to attend huddles in regards to CRR, AHIQA and metrics. This should also include top projects. | • Every attempt should be made to complete your needed reports and on time and to be prepared for regular standing meetings.<br>• Updates on metrics need to be communicated to me regularly. I may need to be updated daily dependent on the report. An example of a daily report I need updated on is the CRR report. Everyone needs to be completing this daily report I need updated on is the CRR daily and providing you their report.<br>• If you are unable to do this please e-mail me (Paul while I'm out) explaining why you are unable to. |
| Begin cross training of coordinators and PSRs. | | • This should be completed by the end of January for seasoned coordinators and by 2/15 for our recent new hires. |
| Training for front desk, scheduling and templates. | You need to be able to jump in if needed at the front desk and also be able to troubleshoot and add on basic appointments (lab, chest x-ray, apheresis, office visit, bone marrow biopsy, etc.) | • This should be completed by the end of January.<br>• So that you don't forget the template training you received you should begin to do simple template changes even if it's opening and blocking. When I receive some of these you can complete them or if needed I can walk you through it. |
| Additional coordinator for leukemia needs to be trained. | Currently when Ziad is out the Resource Center covers to some extent and we need someone trained to be back up when Ziad is out. This person is only going to need to assist in this area when Ziad is out. | • This should be completed by the end of January. |

Please see additional list of responsibilities below.

**Carla's Responsibilities**

o   Check the call off line and e-mail appropriate people. This should be completed no later than 8:15am. If I am able to check it first I will e-mail you the names.
o   Adjust schedules, coverage, lunches according to call offs
o   Open Safe – Copay Bags and Deposit
o   Copay change from cashier
o   The third Thursday of every month hold monthly PSR/Coordinator meeting and the fourth Thursday is the medical secretary meeting.
o   Kronos sign off for schedulers, front desk and secretaries for HOBD/STO, updated daily
o   Keeping track of points
o   Performance reviews

4

o  Corrective actions
o  Orders for needed supplies for front desk and schedulers need to be sent to Bonnie Ludesher. You can assign the review of what needs to be ordered to a coordinator or PSR if you would like but they should give you the order to review and send to Bonnie. If Jessa has offered to have a nurse or MA help with this it is okay but again I would like the order at least initially to be reviewed by you and then sent to Bonnie.
o  Attendance, FMLA, PTO for front desk personnel, schedulers and medical secretaries this should be updated daily for each employee.
o  Attendance at meetings
o  Updating Business Review Deck (BRD) also send successes and challenges to Paul monthly. Reminder was sent a few months ago to you so that it would stay on your calendar as a reminder.
o  4 Harvard Mentor Classes
o  At least one process improvement project completion.
o  Compliance updates
o  KP tablet
o  Co-Pay collection metric (daily)
o  CRR (schedulers and front desk need to complete this daily and e-mail you or print off copy) you will need to report to me weekly on this.
o  AHIQA everyone should be logged on
o  Collaborate with other departments and colleagues to use best practices.
o  Keep employee files updated, etc.
o  Complete Position Manager, sup eval, etc when needed.
o  Other duties as assigned.

Supervisor signature: _____   Date: _____

Employee signature: _____   Date: _____

5



EXHIBIT
4

Copy

# Cleveland Clinic
# Performance Review Form B

## For
## 90-Day Performance Period
## 2014

| | |
|---|---|
| **Employee Name:** | Carla See |
| **Employee Number:** | 476614 |
| **Position Title:** | Department Supervisor II |
| **Department:** | Hematology & Medical Oncology |
| **Supervisor:** | Cheryl Wright |
| **Date of Review:** | 03/31/2014 |
| **Hire Date:** | 02/24/2014 |

| **Check Type of Review:** | ■ 45-day (Optional) | □ 90-day | □ Self-Evaluation |
|---|---|---|---|

Form B
Revised: 11/05/2013

*This form and supporting material are available on the Cleveland Clinic Performance Management Toolkit Intranet Site.*

Employee Name: Carla See

2

### Cleveland Clinic
### Performance Review Form B
### MANAGERIAL COMPETENCY ASSESSMENT

This performance review evaluates key competencies and job specific indicators established for employees functioning in a managerial capacity at Cleveland Clinic. Competencies are to be evaluated according to the scale below. Please indicate a rating for each of the competencies listed. Each competency section should represent a specific weight within the ranges indicated and collectively equal 100%.

| | | *Ratings:* | | |
|---|---|---|---|---|
| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | (2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |

## I. DRIVES MISSION, VISION, VALUES

**Weighting**

Range:
5 - 25%

10 %

**Cleveland Clinic Experience/Values:**

|  | NI | MM | FM | EP |
|---|---|---|---|---|
|  | ☐ | ☐ | ☒ | ☐ |

Adheres to Cleveland Clinic values: Quality, Innovation, Teamwork, Service, Integrity and Compassion. Creates and models a culture where caregivers are given the opportunity to provide the best outcomes for patients and each other. Specifically:
- Connects work to Cleveland Clinic mission, vision and values
- Strives to put Patients First
- Recognizes others for work well done
- Offers coaching and support to others in providing a superior patient experience
- Open to coaching to support and sustain a superior patient experience
- Responds promptly to internal and external customer requests
- Demonstrates the Expected Service Behaviors consistently, effectively, and proactively to patients, family members and colleagues
- Responds effectively to unmet service expectations and provides service recovery through Respond with H.E.A.R.T.™

Additional supportive metrics/objectives (goals) commentary (if available):

Carla actively supports the attainment of the desired Cleveland Clinic Experience through the development of self and others. Carla demonstrates our values, expected service behaviors and Respond with H.E.A.R.T.

Range:
15 - 40%

20 %

**Employee Engagement:**

|  | NI | MM | FM | EP |
|---|---|---|---|---|
|  | ☐ | ☒ | ☐ | ☐ |

Drives team engagement and builds trust through the following behaviors:
- Communicates with the team in a consistent, transparent manner about key Enterprise information
- Explains how organizational changes impact the department and team members
- Provides feedback and facilitates discussion on the previous Employee Engagement survey
- Conducts effective Employee Engagement action planning sessions
- Ensures progress on goals and action items set during action planning sessions
- Leverages Cleveland Clinic resources and tools to support the team's engagement
- Minimizes complexity of processes to support clarity and efficiency
- Makes self available to address questions and obstacles as they arise

Defined Objective: Increase Gallup Engagement & Overall Satisfaction
Measurable Goal: Increase by .20
Result: Overall engagement was down from 3.91 to 3.79

Additional supportive metrics/objectives (goals) commentary (if available):

Carla just began as a Department Supervisor II in this department in February. I'm sure with her positive attitude and team building skills they will increase for next year.

Range:
5 - 25%

10 %

**Serving Leadership:**

|  | NI | MM | FM | EP |
|---|---|---|---|---|
|  | ☐ | ☒ | ☐ | ☐ |

Actively demonstrates the following behaviors and practices:
- Visionary: Leads others to focus on the big picture and connect vision to the role of each caregiver; inspires others to move from uncertainty to clarity
- Emotional Intelligence: Sincere, honest, trustworthy – promotes positive work environment; listens with empathy and expresses appreciation; acts with humility; empowers team members by leveraging strengths and removing barriers
- Accountability and Drive: Has high expectations of self and others and expresses them clearly; co-creates a culture of commitment to achieve outcomes; proactively plans, sets priorities and executes plans with others
- Leadership: Motivates, inspires and influences across multiple levels; promotes collaboration and shared leadership; leads change and exhibits resiliency; makes effective decisions; uses good, sound judgment
- Develop Self and Others: Demonstrates ability to receive and give effective feedback; mentors and encourages others to succeed; creates and implements appropriate developmental plans for self, individuals and team

Additional supportive metrics/objectives (goals) commentary (if available):

I can see Carla beginning to create a sense of purpose with her employees while striving to create benefits for all stakeholders. I can see Carla creating teams with well defined and aligned roles. She has also become a mentor for LaToya.

Employee Name: Carla Seo

3

## II. FUNCTIONAL/TECHNICAL EXCELLENCE

| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | Ratings:<br>(2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |
|---|---|---|---|---|

**Weighting**

Range:
10 - 65%

**Key Functional/Technical Excellence:** Evaluate key performance indicators/metrics that illustrate the incumbent's success in meeting goals/expectations. These expectations should include behaviors that are reflective of the Cleveland Clinic values of **Service, Teamwork, Quality, Innovation, Integrity and Compassion**, as appropriate. Following the identification and rating of each indicator/metric, provide an overall rating (EP, FM, etc.) on the line provided.

| | | | NA | NI | MM | FM | EP |
|---|---|---|---|---|---|---|---|
| 20 % | Metric 1: | General Management & Administrative Expertise: (skillfully manages human resources, timeliness with orginization deadlines and assignments, expert relationship building and sound problem solving. | ☐ | ☐ | ☐ | ☑ | ☐ |
| 20 % | Metric 2: | Process Improvement, Project & Initiative Management: Identifies opportunities to reduce costs, improve efficiencies, value based proposals. Is able to suggest appropriate improvement ideas & to run projects. | ☐ | ☐ | ☑ | ☐ | ☐ |
| 20 % | Metric 3: | Operational Expertise:Manages BRD metrics & initiates other internal metrics/monitors to manage business. Has a firm grasp on financial, pt. quality & pt safety concepts. Responsible for business growth and/or increases in throughpu | ☐ | ☐ | ☑ | ☐ | ☐ |
| % | Metric 4: | | ☐ | ☐ | ☐ | ☐ | ☐ |

Additional key performance indicators/metrics may be added on the Form B Addendum.

OVERALL KEY FUNCTIONAL/TECHNICAL EXCELLENCE RATING:          Fully Meets Expectations (3)

**Essential Job Requirements:** *Follows and upholds all relevant policies, procedures and guidelines affecting the work environment, including maintenance of required competencies and communication skills.*

| | NO | YES |
|---|---|---|
| Attends appropriate training and meetings. | ☐ | ☑ |
| Completes appropriate unit/department specific competency checklists. | ☐ | ☑ |
| Demonstrates knowledge and behavior related to regulatory and patient safety requirements. | ☐ | ☑ |
| Complies with policies and procedures. | ☐ | ☑ |
| Conducts monthly departmental meetings with minutes. | ☐ | ☑ |
| Ensures enterprise wide communications are cascaded and initiatives are effectively implemented. | ☐ | ☑ |

Employee Name: Carla See

4

## III. FINAL RATING SUMMARY

| | | *Ratings:* | | |
|---|---|---|---|---|
| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | (2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |

Please complete the final rating summary section below by indicating the rating and then multiplying by the appropriate weight for each category. Add the scores to calculate the overall score. Match the overall score with the appropriate rating listed below.

| Category | A<br>Numerical Rating | B<br>Weight, % | A × B / 100<br>Overall |
|---|---|---|---|
| I. Mission, Vision and Values | | | |
| Cleveland Clinic Experience/Values | 3 | 10 | 0.30 |
| Employee Engagement | 2 | 20 | 0.40 |
| Serving Leadership | 2 | 10 | 0.20 |
| II. Key Functional/Technical Excellence | 3 | 60 | 1.80 |
| | | 100% | Total: 2.70 |

| **Final Rating Summary:** | ☐ Needs Improvement (<1.50) | ■ Fully Meets Expectations (2.51 – 3.50) |
|---|---|---|
| (Please fill in only one) | ☐ Meets Most Expectations (1.50 – 2.50) ☐ | Exceptional Performance (3.51 – 4.00) |

Employee's Comments:

Supervisor's Comments:

Carla is a great addition to Taussig. Carla is consistent in keeping meetings with employees and management. She is already involved with the med sec and scheduler team boards. Carla is building trust and accountability within her team. She is sincere and is promoting a positive work environment. I would like Carla to chose at least 4 classes from the Harvard Manage Mentor in CCLC to complete this year. I have already signed Carla up to complete Building on Managerial Capabilities in May and I would also like for Carla to complete Fundamentals of Supervision during 2014.

*Additional comments may be added on the Form B Addendum.*

| Employee's Signature | | Date: |
|---|---|---|
| Supervisor's Signature | | Date: 03/31/2014 |
| Administrative Approval | | Date: |

The employee's signature does not necessarily infer agreement or disagreement with the performance review. The signature merely signifies that the employee was given the opportunity to discuss past performance and future potential with his/her immediate supervisor.

In addition, the employee's signature does reaffirm his/her understanding as to the importance of confidentiality of information. Specifically, the acquisition, release, discussion, or other use of confidential information for purposes other than to conduct normal authorized business activities is strictly prohibited.

EXHIBIT

5

# Cleveland Clinic
# Performance Review Form B

# For
# 90-Day Performance Period
# 2014

| | |
|---|---|
| **Employee Name:** | Carla See |
| **Employee Number:** | 476614 |
| **Position Title:** | Department Supervisor II |
| **Department:** | Hematology & Medical Oncology |
| **Supervisor:** | Cheryl Wright |
| **Date of Review:** | 05/05/2014 |
| **Hire Date:** | 02/24/2014 |

| **Check Type of Review:** | ☐ 45-day (Optional) | ☑ 90-day | ☐ Self-Evaluation |
|---|---|---|---|

Form B
Revised: 11/05/2013

*This form and supporting material are available on the Cleveland Clinic Performance Management Toolkit Intranet Site.*

Employee Name: Carla See

2

### Cleveland Clinic
### Performance Review Form B
### MANAGERIAL COMPETENCY ASSESSMENT

This performance review evaluates key competencies and job specific indicators established for employees functioning in a managerial capacity at Cleveland Clinic. Competencies are to be evaluated according to the scale below. Please indicate a rating for each of the competencies listed. Each competency section should represent a specific weight within the ranges indicated and collectively equal 100%.

| | | *Ratings:* | | |
|---|---|---|---|---|
| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | (2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |

### I. DRIVES MISSION, VISION, VALUES

**Weighting**

Range:
5 - 25%

10 %

**Cleveland Clinic Experience/Values:**

NI ☐  MM ☐  FM ☑  EP ☐

Adheres to Cleveland Clinic values: Quality. Innovation. Teamwork, Service, Integrity and Compassion. Creates and models a culture where caregivers are given the opportunity to provide the best outcomes for patients and each other. Specifically:
- Connects work to Cleveland Clinic mission. vision and values
- Strives to put Patients First
- Recognizes others for work well done
- Offers coaching and support to others in providing a superior patient experience
- Open to coaching to support and sustain a superior patient experience
- Responds promptly to internal and external customer requests
- Demonstrates the Expected Service Behaviors consistently, effectively, and proactively to patients. family members and colleagues
- Responds effectively to unmet service expectations and provides service recovery through Respond with H.E.A.R.T.™

Additional supportive metrics/objectives (goals) commentary (if available):

Carla demonstrates exceptional behavior in putting our patients and caregivers first. Carla continues to demonstrate CC values and expected service behaviors.

Range:
15 - 40%

20 %

**Employee Engagement:**

NI ☐  MM ☑  FM ☐  EP ☐

Drives team engagement and builds trust through the following behaviors:
- Communicates with the team in a consistent, transparent manner about key Enterprise information
- Explains how organizational changes impact the department and team members
- Provides feedback and facilitates discussion on the previous Employee Engagement survey
- Conducts effective Employee Engagement action planning sessions
- Ensures progress on goals and action items set during action planning sessions
- Leverages Cleveland Clinic resources and tools to support the team's engagement
- Minimizes complexity of processes to support clarity and efficiency
- Makes self available to address questions and obstacles as they arise

Defined Objective: Increase Gallup Engagement & Overall Satisfaction
Measurable Goal: Increase of 0.20
Result: Overall engagement was down from 3.91 to 3.79

Additional supportive metrics/objectives (goals) commentary (if available):

Carla took over the STO on 2/24/2014 and since that time we have been working as a team (LaToya, Carla & I) to begin to increase engagement. I'm sure with her positive attitude and skill in building teams scores will increase for next year.

Range:
5 - 25%

10 %

**Serving Leadership:**

NI ☐  MM ☐  FM ☑  EP ☐

Actively demonstrates the following behaviors and practices:
- Visionary: Leads others to focus on the big picture and connect vision to the role of each caregiver: inspires others to move from uncertainty to clarity
- Emotional Intelligence: Sincere, honest, trustworthy – promotes positive work environment; listens with empathy and expresses appreciation; acts with humility: empowers team members by leveraging strengths and removing barriers
- Accountability and Drive: Has high expectations of self and expresses them clearly; co-creates a culture of commitment to achieve outcomes: proactively plans, sets priorities and executes plans with others
- Leadership: Motivates, inspires and influences across multiple levels: promotes collaboration and shared leadership; leads change and exhibits resiliency; makes effective decisions; uses good, sound judgment
- Develop Self and Others: Demonstrates ability to receive and give effective feedback: mentors and encourages others to succeed; creates and implements appropriate developmental plans for self, individuals and team

Additional supportive metrics/objectives (goals) commentary (if available):

Carla communicates with her team and management in a consistent. clear and transparent manner. She demonstrates Serving Leader behaviors and leads with Emotional Intelligence. She also continues to help mentor Latoya.

Employee Name: Carla See                                    3

## II. FUNCTIONAL/TECHNICAL EXCELLENCE

| | | Ratings: | | |
|---|---|---|---|---|
| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | (2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |

### Weighting

**Range:**
**10 - 65%**

**Key Functional/Technical Excellence:** Evaluate key performance indicators/metrics that illustrate the incumbent's success in meeting goals/expectations. These expectations should include behaviors that are reflective of the Cleveland Clinic values of Service, Teamwork, Quality, Innovation, Integrity and Compassion, as appropriate. Following the identification and rating of each indicator/metric, provide an overall rating (EP, FM, etc.) on the line provided.

| | | | NA | NI | MM | FM | EP |
|---|---|---|---|---|---|---|---|
| 20 % | Metric 1: | General Management & Administration Expertise: (skillfully manages human resources, timeliness with organization deadlines and assignments, expert relationship building and sound problem solving. | ☐ | ☐ | ☐ | ▣ | ☐ |
| 20 % | Metric 2: | process Improvement, Project & Initiative Management: Identifies opportunities to reduce costs, improve efficiencies, value based proposals. Is able to suggest appropriate improvement ideas & run projects. | ☐ | ☐ | ☐ | ▣ | ☐ |
| 20 % | Metric 3: | Operational expertise: Manages BRD metrics & initiates other internal metrics/monitors to manage business. Has a firm grasp on financial, pt. quality & pt. safety concepts. Responsible for business growth and/or increases in throughp | ☐ | ☐ | ▣ | ☐ | ☐ |
| % | Metric 4: | | ☐ | ☐ | ☐ | ☐ | ☐ |

Additional key performance indicators/metrics may be added on the Form B Addendum.

OVERALL KEY FUNCTIONAL/TECHNICAL EXCELLENCE RATING:                Fully Meets Expectations (3)

**Essential Job Requirements:** *Follows and upholds all relevant policies, procedures and guidelines affecting the work environment, including maintenance of required competencies and communication skills.*

| | NO | YES |
|---|---|---|
| Attends appropriate training and meetings. | ☐ | ▣ |
| Completes appropriate unit/department specific competency checklists. | ☐ | ▣ |
| Demonstrates knowledge and behavior related to regulatory and patient safety requirements. | ☐ | ▣ |
| Complies with policies and procedures. | ☐ | ▣ |
| Conducts monthly departmental meetings with minutes. | ☐ | ▣ |
| Ensures enterprise wide communications are cascaded and initiatives are effectively implemented. | ☐ | ▣ |

Case: 1:15-cv-01894-DAP Doc #: 1-1 Filed: 09/15/15 48 of 51. PageID #: 52

Employee Name: Carla See

4

## III. FINAL RATING SUMMARY

| | | Ratings: | | |
|---|---|---|---|---|
| (0)<br>Not Applicable<br>(NA) | (1)<br>Needs Improvement<br>(NI) | (2)<br>Meets Most Expectations<br>(MM) | (3)<br>Fully Meets Expectations<br>(FM) | (4)<br>Exceptional Performance<br>(EP) |

Please complete the final rating summary section below by indicating the rating and then multiplying by the appropriate weight for each category. Add the scores to calculate the overall score. Match the overall score with the appropriate rating listed below.

| Category | A<br>Numerical Rating | B<br>Weight, % | A × B / 100<br>Overall |
|---|---|---|---|
| I. Mission, Vision and Values | | | |
| Cleveland Clinic Experience/Values | 3 | 10 | 0.30 |
| Employee Engagement | 2 | 20 | 0.40 |
| Serving Leadership | 3 | 10 | 0.30 |
| II. Key Functional/Technical Excellence | 3 | 60 | 1.80 |
| | | 100% | Total: 2.80 |

| Final Rating Summary: | ☐ Needs Improvement (<1.50) | ☒ Fully Meets Expectations (2.51 – 3.50) |
|---|---|---|
| (Please fill in only one) | ☐ Meets Most Expectations (1.50 – 2.50) ☐ | Exceptional Performance (3.51 – 4.00) |

Employee's Comments:

Supervisor's Comments:

Carla continues to do a great job in acclimating to her role. I'm grateful to be working with Carla and I foresee her becoming a great asset to Taussig. She recognizes resources to help problem solve. She is beginning to establish relationships in order to implement improvements. Carla keeps promises and follows through on commitments. Carla is actively working on engagement with the latest project being a Communication & Listening class the group asked to have. Engagement will be important for Carla to continue to monitor and make necessary changes to increase scores. Carla is still learning our scheduling process as well as becoming familiar with some of our metrics, Press Ganey, Gallup & how to document in our Business Review Deck. Carla will be attending Building Managerial Capabilities for the next 5 Wednesday's beginning 5/7/14 and will also be attending the New Leader Orientation 8/13/14. I look forward to working with Carla in 2014 and I'm confident that she will meet the goals of the department, institute and enterprise.

*Additional comments may be added on the Form B Addendum.*

| Employee's Signature | | Date: |
|---|---|---|
| Supervisor's Signature | | Date: 05/05/2014 |
| Administrative Approval | | Date: |

The employee's signature does not necessarily infer agreement or disagreement with the performance review. The signature merely signifies that the employee was given the opportunity to discuss past performance and future potential with his/her immediate supervisor.

In addition, the employee's signature does reaffirm his/her understanding as to the importance of confidentiality of information. Specifically, the acquisition, release, discussion, or other use of confidential information for purposes other than to conduct normal authorized business activities is strictly prohibited.

Electronically Filed 08/13/2015 12:48 / / CV 15 849699 / Confirmation Nbr. 517144 / CLTLC

**EXHIBIT**

**6**

▊▊ **Cleveland Clinic**

**March 6, 2015**

**Carla See**

**Dear Carla:**

Cleveland Clinic has made the business decision to eliminate your position. This difficult decision was necessitated by the changing landscape of the health care industry and the need to operate more efficiently in the future. In order to address these issues, each department within the Cleveland Clinic has had to review its operations and develop a more cost effective manner in which to provide services to patients while simultaneously maintaining the same quality of care upon which the Cleveland Clinic's strong reputation is based.

In an attempt to ease your transition from employment with the Cleveland Clinic, the effective date of your termination of active employment will be sixty (60) days from the date of this notice ("Transition Period"). Cleveland Clinic will continue to pay you your regular salary during the entire Transition Period regardless of whether or not you are required to come to work by your supervisor. Whether you are required to work throughout the entire Transition Period will be determined by business needs. Your manager will inform you of that portion of the Transition Period you are expected to work if less than the entire duration. Your Transition Period will start today and run through **May 5, 2015.**

According to the Cleveland Clinic Outplacement/Severance Policy, when your position is eliminated for financial reasons you are entitled to severance benefits upon the conclusion of your employment provided certain requirements (discussed below) are satisfied. Employees are eligible for two weeks of severance for each year of service with the organization, subject to maximums calculated based upon your individual employment classification. In your case, you will be entitled to **2** weeks of severance benefits paid as salary continuation following the end of your Transition Period. If you meet all requirements set forth herein, your Severance Period will begin on **May 6, 2015** and end on **May 19, 2015.** You will also be entitled to outplacement services as detailed in the attached document.

The severance benefits explained in this letter are benefits in excess of those you would normally be entitled to receive and, therefore, are expressly conditioned upon you signing and timely returning to Cleveland Clinic a General Release and Waiver Agreement (Agreement). The Agreement is included in this packet and more fully explains your benefits and rights. Cleveland Clinic will provide you a period of twenty-one (21) days in which to review and consider the Agreement before signing (Review Period). In addition, if you elect to sign the Agreement, you will have a period of seven (7) days from the date that you sign to revoke the Agreement in writing.

If after fully reviewing the Agreement you decide to agree to its terms and receive your severance benefits, you must sign the Agreement and return it to Cleveland Clinic at the following address by **March 27, 2015.**

Please return the General Release to:

> Cleveland Clinic
> Attn: Human Resources, Employee Relations
> 3050 Science Park Drive AC332b
> Beachwood, Ohio 44122

If you decide not to sign the Agreement, do not return the signed Agreement to Employee Relations by the date set forth above or revoke the Agreement, all salary payments will be discontinued and you will not be entitled to the receipt of severance benefits. Please be mindful of the return date and take care to return the signed Agreement in order to avoid forfeiture of severance benefits. Cleveland Clinic will not accept the return of the signed Agreement after **March 27, 2015.**

Please note that your receipt of the severance benefits is conditioned upon not only your signing and return of the Agreement but also the successful completion of your duties throughout the Transition Period (or the portion of the period you are asked to work). As a Cleveland Clinic employee during the Transition Period (whether you are required to come to work or not), it is expected that you will continue to reflect the mission and values of the Clinic and comply with all applicable Cleveland Clinic policies. In the event your employment should be terminated for failure to comply with such policies at any time during your Transition Period, or should you choose to voluntarily resign from the Clinic at any time during the Transition Period, the Clinic's obligation to continue your pay during this Transition Period and, therefore, any commitment to provide severance benefits, will immediately terminate. Also, if you are offered a comparable position (as that term is defined in the Outplacement/Severance Policy), you will not be entitled to severance benefits regardless of whether or not you accept the comparable position.

All of your elected benefits (and employee contributions) will continue without change throughout the Transition Period. If you choose to sign the Agreement and return it to Cleveland Clinic in a timely manner (dated, signed and returned by date set forth above), your elected benefits will also continue without change during the Severance Period. These benefits include the Health Plan, Dental Plan, Vision Plan, Life Insurance, Flexible Spending Accounts and SIP plans you have chosen. Contributions will continue to be made to the Investment Pension Plan during the Transition Period and Severance Period (if you signed and timely returned the Agreement). Note that Long Term (LTD) and Short Term (STD) benefits cease as of the last day of the Transition Period

At the conclusion of the Transition Period (if you choose not to sign the Agreement) or your Severance Period (if you choose to sign and timely return the Agreement), you will be offered the opportunity to elect to continue coverage in the Health Plan and Dental Plan for a period of up to eighteen (18) months beyond the end of the Transition Period or Severance Period, as the case may be ("COBRA Continuation Coverage"). If you elect this continuation coverage, you will be responsible for the entire cost of the premium. You will receive notice from PayFlex regarding the election of those benefits the month after your Transition or Severance Period ends, dependant upon whether or not you sign and timely return the Agreement.

Paid Time Off (PTO) will continue to accrue during the Transition Period. All accrued paid time off will be paid in a pay check following the end of your employment if you choose not to sign the Agreement, or in a check following the end of your Severance Period if you sign and timely return the Agreement.

Finally, the elimination of your position with the Cleveland Clinic will be considered an involuntary termination without misconduct. As such, Cleveland Clinic will not contest any application for Unemployment Insurance Benefits based on the elimination of your position.

Again, Cleveland Clinic is sorry to have to inform you of this difficult business decision. If you have questions regarding any of the information contained in this notice, the Agreement or otherwise, please call **Jodi Olivo at 216-445-2684**. Cleveland Clinic stands ready to assist you in any way it can during this difficult time.

Cleveland Clinic

By: _Jodi Olivo_